OPINION OF THE COURT
Vincent J. Reilly, Jr., J.
*127 The difficult issue before this court is whether to infer a finding of child neglect solely on the basis of the mother’s mild mental retardation, thereby depriving her of the opportunity to parent her four-month-old child. The issue is raised in the context of a record devoid of any evidence of actual harm or neglectful acts by respondent towards the infant. In fact, respondent mother has at all times cared for the child to the best of her ability. The limitations of mental retardation and whether same, in and of themselves, should result in a presumption of an inability to parent is a novel question of first impression for this court, although precedent affirming neglect adjudications on facts beyond those present here has paused upon the issue now squarely before this court. (See, Matter of Trina Marie H., 48 NY2d 742 [1979]; Matter of Jesse DD., 223 AD2d 929 [3d Dept 1996], lv denied 88 NY2d 803 [1996].) Other jurisdictions have also looked to New York decisional law for guidance on the nexus to be required to sustain a finding of child neglect between some parental imperfection and actual indicia of neglect. (See, Interest of I.T. v State, 532 So 2d 1085 [Fla 1988].)
This is actually the second time this respondent has faced child protective proceedings. Respondent’s first child, John, was removed from her care four days following his birth due to hotline reports concerned with the likelihood that respondent could not adequately care for the newborn due to her mental retardation. Following some three years of child protective proceedings and, ultimately, a permanent termination proceeding under Social Services Law § 384-b, this very court previously found that respondent’s impairment rendered her unable to provide proper and adequate care for John by fact-finding decision and order entered December 30, 1994. The order echos the conclusion of the numerous professionals, including psychologists, caseworkers, and court-appointed special advocates, that respondent’s impairment was expected to continue for the foreseeable future and rendered her incapable of becoming any more responsible than she presently was, necessitating the court’s ruling that she not be entrusted with the child’s basic needs. Her parental rights to the child, John, were ultimately terminated by this court by order entered March 27, 1995: — the same date that this court approved the surrender by the natural father, Richard M. The child, John, was thereafter adopted by his foster parents.
The respondent gave birth to another child, Loraida, on May 26, 1999. (It should be noted that the record discloses three dif *128 ferent spellings for this child’s name and the correct one may be “Lorata” or “Loreda.”) As with John, within days following her birth, this child was removed from respondent’s care by the Department of Social Services. The respondent’s boyfriend, Raymond S., acknowledged paternity of Loraida and an order of filiation was entered on consent on July 9, 1999. The Department of Social Services now alleges that Loraida is a neglected child by reason of respondent’s mental retardation and her failure to avail herself of services to assist her in being able to care for the child.
It strikes the court that this unusual case presents somewhat of the opposite factual pattern than that generally encountered in Family Court Act article 10 proceedings. Whereas parents generally know, or should know, the skills necessary to adequately meet their child’s needs and fail to employ them for the safety of such child, resulting in a finding of abuse and/or neglect, this respondent actively seeks to learn and utilize the requisite skills for the chance to prove herself as a worthy parent, entitled to express the love and nurturance taken for granted by the u,sual respondents before this court in child protective proceedings.
At the outset, the court notes the inapplicability of the large body of case law addressing mental retardation and permanent termination of parental rights, pursuant to Social Services Law § 384-b (4) (c) and (6) (e). Such cases involve findings of specific and definite criteria not presented in proceedings under article 10 of the Family Court Act.
A determination that a child has been neglected within the meaning of Family Court Act article 10 requires a finding that a child’s physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the parent’s failure to exercise a minimum degree of care. (Family Ct Act § 1012 [f] [i].) Such a finding must be based upon a preponderance of the evidence. This is not a case where a parent is unwilling to render adequate care for a special needs child. (See, e.g., Matter of Patriarche O., 233 AD2d 448 [2d Dept 1996]; Matter of William L. v Betty T., 243 AD2d 860 [3d Dept 1997].) In fact, the converse is true. She seeks nothing but to care for her child.
The psychological evaluation conducted by Dr. A. clearly confirms that respondent is indeed mildly mentally retarded. The testing results were found by Dr. A. to be highly reliable. All of respondent’s symptomatology was determined to be consistent with her mental retardation such as her difficulty with *129 counting money, basic math, assembly of visual concepts, motor response and a generalized level of deficit in all testing areas. Interestingly, however, Dr. A. points out that respondent attempted test questions even beyond her success. The court views this as indicia of her motivation towards the return of this child. The court does not dispute that she is, in fact, mentally retarded. (Cf., Matter of Iliana C., 206 AD2d 473 [2d Dept 1994].) The issue for the court, however, is whether her cognitive limitations as a result of mild retardation are justification, standing alone, for a finding of neglect.
The evidence presented at trial makes it clear to the court that respondent enjoys much greater stability in her life presently than the dangers she encountered as a result of exercising poor judgment in her past. Such dangers included allowing strangers to sleep or live in her apartment, walking down dark alleys unaccompanied, repeated evictions due to noise and destruction of property, relationships with men not well known to her resulting in sexual assaults, utilizing all of her monthly supplemental security income money within a few days and then depending upon the City Mission for sustenance and being generally unable to care for herself. In fact, the respondent herself does not like to reflect upon her past.
At present, the court has been informed that respondent recently began residing with the father of the subject child, Raymond S. He is gainfully employed and has openly acknowledged paternity of the child and petitioned himself for an order of filiation. He accompanied respondent to her scheduled clinical evaluation to determine her cognitive and emotional status, and sought to be evaluated himself. Mr. S. has other children with his estranged wife. Until this recent cohabitation, respondent resided in an apartment sponsored by the Association for Retarded Citizens (ARC). As far as the court is aware, respondent continues to be employed by McDonald’s. She has consistently expressed her love and devotion for this child. She has sought out and participated in the various supportive services aimed at teaching her necessary parenting skills. She has appeared for scheduled evaluative appointments, case meetings and court appearances. She has demonstrated her ability to feed, clothe, protect and nurture this child in a stable living situation by parenting her for five hours per day Mondays through Fridays in her home, under the supervision of her customary home health aide and/or public health nurse. In fact, the testimony of respondent’s personal care aide, Nancy K., of Alternative Care of Northeastern New York, was that having *130 initially instructed respondent in the techniques of feeding, burping, bathing and setting the baby down for naps, she is now in respondent’s home during her parenting time as a casual observer. She further testified that respondent herself makes the formula and has the necessary supplies for the infant’s care. On the two occasions when the child was ill, Ms. K. testified that the respondent was attentive to her needs, correctly administered medication and comforted the child’s crying. She was also consoling at times of the child’s immunizations. As a practical matter, Ms. K. recognized respondent’s retention and greater understanding when instructed through being shown the proper technique, rather than through verbal directions. Clearly, respondent was viewed as a comforting parent to this child.
Although it is maintained that respondent continues to make poor decisions concerning interpersonal relationships and accepts progressively less assistance from ARC, the court is impressed with her obvious growth in maturity and anger management since the earlier proceedings. In spite of the criticism by her support caretakers borne out of her growing desire for an independent lifestyle to the extent possible, she has managed to sustain herself. The testimony of respondent’s ARC counselor, Annmarie P., who observed respondent with the child for four hours per week, was that at no time was there any inappropriate caretaking of the child. Her testimony, however, also relayed the respondent’s unequivocally expressed intention to terminate all services received through the ARC’S community living resource program. Notwithstanding the professional doubts, respondent has attained the skills and learned the lessons to function with some degree of freedom in caring for herself. At the age of 29, no longer is respondent overwhelmed with the responsibilities of caring for herself and a child.
Similarly, respondent’s registered public health nurse, Susan B., who also testified at trial, was that respondent has effectively accomplished the physical caretaking of the child regarding feeding, bathing, taking temperature, etc., and the child appears relaxed and comfortable with respondent. Other than recommending respondent’s referral to the Healthy Schenectady Families program, the testimony of this witness as well supports a finding that respondent has the ability to care for her child. The testimony of Margaret S., of Schenectady County Public Health Services, also endorsed respondent’s participation in this program.
*131 Even ARC’s Assistant Director of Residential Services, Jessica K., who initiated some 10 contacts with respondent over the past year, and was at times less than fully satisfied with respondent’s seeking of prenatal care, testified that respondent did much of the preparation for the baby’s arrival on her own, including acquiring a crib, stroller, diapers, etc.
The facts of this case are thus readily distinguishable from those of Matter of Joshua O. (227 AD2d 695 [3d Dept 1996]), wherein the mother’s mild mental retardation and mental condition had deteriorated throughout the duration of the proceedings as opposed to the situation herein where respondent’s maturity and judgment have improved, despite the cognitive limitations of her disability.
Certainly, respondent has more to learn about the basic needs of this developing now five-month-old infant as to the incorporation of solid food, child safety, stimulation, etc. However, with the supportive services in place and respondent’s openness to the instruction, the court does not deem her different than any new parent who must learn and adapt along with the stages of their developing child. Whether through grandparents, relatives, day care providers, babysitters, friends, instructional books, parenting skills courses, or trial and error, all first-time parents must at the appropriate time learn the mixture of infant formula and baby cereal, the increased daily food allowances, how frequently a diaper requires changing, the steps of potty-training and the like. However, where the foundation of the parent-child bond is strong, these are skills that are eagerly learned. The court does not believe this respondent is incapable of mastering these skills due to her mild mental retardation and will not divest her of the opportunity to rear her child solely on the basis of such disability unaccompanied by any true shortcoming which has posed some genuine risk to the child’s safety or well-being. The evidence presented to this court is devoid of any such proof. (Cf., Matter of Trina Marie H., 48 NY2d 742 [1979], supra [affirming a neglect finding holding that the mother’s mental retardation, while not a per se basis for a finding of neglect, added to the legitimate concern that her toleration of her husband’s beating of the child and her own manhandling of the child and repeatedly leaving the child at home unattended, would not readily yield to reformation].) In contrast, in the instant matter it is simply respondent’s mental retardation in and of itself which serves as the basis for the requested neglect adjudication.
The court does not find that respondent’s lack of mathematical skills so as to compute how many diapers the baby will *132 need in one day or how many ounces of formula is required for a full 24-hour period will necessarily result in a deficiency to the child, where respondent is sufficiently capable of learning this information. Thus far, she has been taught only the lesser requirements for five hours of daily parenting. The court does not doubt that respondent will do as she is instructed with regard to the baby’s care, as she has in the past. Having had both her children removed within days of birth, she has yet to be presented the opportunity for a full day of parenting. Nor does the court find that the rigidity with which she meets the child’s diapering needs is cause for a neglect finding. Simply wiping the child in the same patterned manner every time, provided same is a correct cleansing, is not tantamount to neglect. Flexibility is a tool respondent does not possess due to cognitive limitations of no fault of her own and she ought not be held to the impossible standard of being both criticized for not knowing what to do and zealously following the directions of what she has been taught.
The court simply finds no evidence of past or present neglect. There is only a fear that the child might be at an increased risk of prospective neglect because of respondent’s mental retardation. The court does not deem this premonition as sufficient grounds to deprive her of the association of her child. A parent’s right to the association of her child is constitutional in nature. (Matter of Christian Eve P., NYLJ, Sept. 28, 1999, at 35, col 3.) As stated in I.T. v State (532 So 2d 1085, 1090 [Fla], supra), “[flor the state to deprive parents of custody of their natural child, something more — indeed according to the statutes a great deal more — is required than a generalized conclusion that the parents lack the requisite ‘skills’ to bring up a child.” Parents have a fundamental right to raise their children and the State may intervene only where necessary to protect the child’s life, health or safety. (Matter of Katherine C., 122 Misc 2d 276 [Fam Ct, Richmond County 1984].) Nor does this court believe that respondent is destined or predisposed to neglect the child due to her cognitive limitations. Such thinking is indeed highly speculative. (Cf., Matter of Jarred R., 236 AD2d 888 [4th Dept 1997]; Matter of Eugene G., 76 AD2d 781 [1st Dept 1980].) Moreover, given the various supportive services ready to continue aiding her in proper parenting, there is no justification for an assumption that would deprive respondent of the parent-child relationship. (Cf., Matter of Jesse DD., 223 AD2d 929 [3d Dept 1996], lv denied 88 NY2d 803 [1996], supra [holding that while mental illness will *133 not, per se, support a finding of neglect, such a finding is appropriate if a preponderance of the evidence shows that there would be a substantial probability of neglect if the child were released to the mother due to the mother’s failure to engage in after-care treatment resulting in an inability to care for the children].) Such holding is factually distinguishable from the case at bar where the respondent stands ready to undertake the primary care of her child surrounded by supportive services.
It is equally well settled that a child’s best interests are served when in their parent’s custody. (Matter of Ronald FF. v Cindy GG., 70 NY2d 141 [1987].)
The court recognizes that the rights of a parent are subordinate to the purpose of child protective cases to protect children from parents who are either unable or unwilling to discharge their parental responsibilities properly. (Matter of Kathleen OO., 232 AD2d 784, 786 [3d Dept 1996], citing Matter of Charles DD., 163 AD2d 744, 747 [3d Dept 1990].) Here, there is simply no evidence of respondent’s inability or unwillingness to parent this child. In fact, the evidence is to the contrary based on the present visitation structure of five hours per day. Undisputably, respondent’s mild retardation causes her to lack higher intellectual functioning and certain reasoning skills. However, she possesses the capacity to love, nurture, comfort and encourage her child, unless deprived of the chance to foster same.
In the very recent decision of Matter of Christian Eve P. (NYLJ, Sept. 28, 1999, at 35, col 3, supra), reaffirming the need for the confidentiality of mental health records, the court reflects on the enhanced level of due process to be afforded a mentally handicapped respondent because of the possibility of a future application for severance of the parent-child relationship. This is all the more true in light of the passage of the Federal Adoption and Safe Families Act of 1997 (42 USC §§ 673b, 678, 679b, added by Pub L 105-89, 111 US Stat 2115). Pursuant to such legislation, the mere fact of a child’s placement under an article 10 neglect finding can lead ultimately to a termination of that parent’s rights. Thus, this court’s reluctance to assume neglect against a mother who, through supervised visitation with the child, has demonstrated her ability to care for her with the guidance of regular supportive services.
This court will not embrace a determination that mild mental retardation is per se or ipso facto child neglect. Based upon the *134 preponderance of the credible evidence, the neglect petition is denied and dismissed pursuant to Family Court Act § 1051 (c). The child is to be returned to respondent forthwith.
Having so ruled, however, the court must impose a necessary caveat in recognition of the critical need for supportive services, especially during the child’s early developmental and pre-verbal years. New information provided to the court after the close of proof in this case is that respondent has terminated all involvement with ARC. Having found no neglect, the court lacks the authority to mandate supportive and/or supervisory services for this respondent. Nevertheless, the court’s return of this child is the result of the respondent’s own recognition that she requires such services in order to take the best care possible of her child. The court is far less tolerant of her self-interest in independence and privacy given the impact such an attitude may have on the child. Her use of the available community-based programs is critical. Should respondent fail to avail herself voluntarily of the established services already routinely providing her supportive assistance, this court may be expected to make a future finding that such failure is akin to neglect.
Respondent simply must, albeit voluntarily, participate in the services and programs aimed at assisting her in providing a safe home for the child, putting her own personal feelings aside. Essentially, respondent has the opportunity to show that she can continue to exercise good judgment in regard to the child. (See, e.g., Matter of Heather E., 238 AD2d 678 [3d Dept 1997]; Matter of Sarah B., 203 AD2d 747 [3d Dept 1994]; but cf., Matter of Lonette Monique C., 236 AD2d 880 [4th Dept 1997]; Matter of Shaneek Christal W., 122 AD2d 215 [2d Dept 1986]; Matter of Michael E., 241 AD2d 635 [3d Dept 1997]; Matter of Daniel C., 47 AD2d 160 [1st Dept 1975].) This opportunity may not come again, should respondent fail to recognize the practical necessity for these services in light of her limitations.